**In re James Robert BARROWS and Terri Lee Barrows, Debtors.**

No. 08–43503.

United States Bankruptcy Court, D. Minnesota.

Jan. 9, 2009.

Alan J. Albrecht, Brooklyn Center, MN, for Debtors.

Julia A. Christians, Lapp, Libra, Thomson, Stoebner & Pusch, Minneapolis, MN, Trustee.

## MEMORANDUM OPINION AND ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for trial on November 18, 2008 on the objection of the trustee, Julia A. Christians, to the debtors' claim of exemption of $ 13,970.19 held in a checking account. The trustee appeared *in propria persona* and Alan J. Albrecht appeared on behalf of the debtors. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and 1334(a) and (b) and Local Rule 1070–1. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (B).

### FACTS

1. Teri and Jim Barrows are a married couple. Jim Barrows works as a training coordinator. Teri Barrows formerly worked as a commission-only mortgage lender.

2. Teri Barrows received a chapter 7 discharge under her former name, Teri Schmitz, in 1995.

3. In early 2008, Teri was out of work and the family's consumer debts became unmanageable. In March of 2008, the Barrows met with an attorney, Alan Albrecht, to discuss bankruptcy. Albrecht gave them a worksheet to fill out and return to him. The worksheet asked questions about the Barrows' income, expenses, and creditors.

4. The worksheet Albrecht provided the Barrows stated, "Official Bankruptcy Forms will be completed using the information that you give in these worksheets and you will be required to sign a declaration stating under penalty of perjury that the information is true and correct." The worksheet did not in any way purport to be an official document and the Barrows did not believe it to be one.

5. Question 16 of the worksheet asked the Barrows to list the "approximate average daily balance" in their bank accounts. In the boxes provided on the worksheet, they listed jointly-owned TCF Bank checking and savings accounts with "approximate average daily balances" of $300.00 and $25.00, respectively. The Barrows filled out Albrecht's worksheet and returned it to him on June 15, 2008. Albrecht's office prepared the Barrows' petition and schedules using the worksheet.

6. After completing their worksheet for Albrecht's office but before they had reviewed and signed their petition and schedules, the Barrows applied for and received a loan from their 401(k) retirement account for living expenses. The loan, in the amount of $17,000.00, was deposited into their TCF Bank checking account on June 30, 2008. They used it to make their June and July mortgage payments and for other expenses.

7. The Barrows went to Albrecht's office on July 7, 2008, where they carefully reviewed their petition and schedules page by page. The Barrows knew at the time that they reviewed the documents that the $17,000.00 loan from their 401(k) had already been deposited into their TCF Bank checking account. Although the electroni

signatures on the Barrows' petition and schedules are dated July 14, 2008, they approved and signed the documents at the July 7, 2008 meeting.

8. Albrecht filed the Barrows' petition and schedules on July 15, 2008.

9. The balance in the Barrows' TCF Bank checking account was $13,918.89 when they filed their petition on July 15, 2008. The Barrows had been actively drawing on the account prior to and after their bankruptcy filing. They received regular statements of the account balance.

10. The Barrows' Schedule B (personal property), which they reviewed, approved and signed on July 7, 2008 and filed on July 15, 2008, discloses their jointly-owned TCF Bank checking and savings accounts. Under the heading "CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION," the Barrows identified their TCF Bank checking and savings accounts as having a current value of $325.00. The Barrows also disclosed a 401(k) on their Schedule B. They declared the current value to be $65,000.00.

11. The Barrows' Schedule C (exemptions), which they reviewed, approved and signed on July 7, 2008 and filed on July 15, 2008, claims an exemption under 11 U.S.C. § 522(d)(5) of the TCF Bank accounts. Under the last column, directing the debtors to declare the "CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION," the value claimed is $325.00. They also claimed their 401(k) retirement account as exempt under 11 U.S.C. § 522(d)(12). The value claimed is $65,000.00.

12. The Barrows' statement of financial affairs, filed with the petition and schedules on July 15, 2008, directed them to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case." In response, the Barrows checked a box marked "None."

13. The Barrows' statement of anticipated changes in income or expenses, filed with the petition and schedules on July 15, 2008, stated that they did not anticipate any income increases over the following year, even though they knew they had recently received the $17,000.00 loan from their 401(k) account.

14. At the meeting of creditors on August 18, 2008, the Barrows testified under oath that their petition and schedules were true, correct, and complete. They provided the trustee with copies of their bank account statements at the meeting but they did not specifically disclose the 401(k) loan or the fact that on the date of filing, their TCF Bank accounts were more than $13,000.00 in excess of the amount stated in their schedules.

15. After the meeting of creditors, the trustee reviewed the Barrows' TCF Bank statements and discovered that on July 15, 2008, the Barrows had $13,918.89 in their TCF Bank checking account. She made a written demand to the Barrows for turnover of the funds in excess of the exempt amount of $325.00.

16. On August 26, 2008, the Barrows filed an amended Schedule B (personal property), stating the current value of their TCF Bank checking and savings accounts to be $13,970.19, and an amended Schedule C (exemptions) claiming the full value of the accounts exempt under 11 U.S.C. § 522(d)(5).

510

## DISCUSSION

■ The issue is not whether the debtors are permitted to amend their schedules. Federal Rule of Bankruptcy Procedure 1009(a) allows debtors to amend a "voluntary petition, list, schedule, or statement [...] as a matter of course at any time before the case is closed." The debtors may amend their schedules as permitted by the rules to *claim* an exemption. *See Armstrong v. Harris (In re Harris)*, 886 F.2d 1011, 1015 (8th Cir.1989) ("Permitting amendment of the exemption schedule is to be distinguished from the separate determination to allow the new exemption claim."); *In re Marshall*, 224 B.R. 399, 400 (Bankr.D.Minn.1998) ("The issue is not whether the debtor can amend his schedule to *claim* his [exemption] under a different statute, but whether or not that claim of exemption will be successful."). The issue is: may the debtors successfully exempt their TCF Bank checking account in the face of an objection, when they knew they had approximately $13,900.00 in the account but had failed to disclose it on their schedules or statement of financial affairs or at their meeting of creditors?

■ Although courts are to freely and liberally allow amendment of exemption claims, that "can be tempered by the actions of the debtor or the consequences to the creditors," especially where the debtors have acted in bad faith or where creditors have been prejudiced. *Kaelin v. Bassett (In re Kaelin)*, 308 F.3d 885, 889 (8th Cir.2002). The trustee bears the burden of establishing bad faith by a preponderance of the evidence. Fed. R. Bankr.P. 4003(c); *Bauer v. Iannacone (In re Bauer)*, 298 B.R. 353, 356 (8th Cir. BAP 2003). Bad faith is assessed under the totality of the circumstances test. *Bauer* at 356 (citing *Kaelin* at 889). Concealment of an asset generally supports a finding of bad faith, and will bar exemption of that asset. *Kaelin* at 890 (citing *Doan v. Hudgins (In re Doan)*, 672 F.2d 831, 833 (11th Cir.1982)).

■ The efficiency of the bankruptcy process depends upon the accuracy and reliability of the petition "without the necessity of digging out and conducting independent examinations to get the facts." *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992) (citing *In re Mascolo*, 505 F.2d 274, 278 (1st Cir.1974) ("The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.")). To that end, "[f]ull and accurate disclosure on bankruptcy schedules is incumbent on any debtor." *In re Soost*, 290 B.R. 116, 126 (Bankr.D.Minn.2003) (citing 11 U.S.C. § 521(1); *Mertz* at 598; *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (8th Cir. BAP 2000)).

The result in this case centers on two uncontested facts: the debtors knew that they had approximately $13,900.00 in their TCF Bank accounts and they knew their schedules indicated the balances to be $325.00. In addition, they omitted any reference to the transfer on their statement of financial affairs and they testified at their meeting of creditors that their schedules were true, correct and complete. The only explanation given for their ongoing concealment was that they were attempting to be consistent with the information they had provided to their attorney on a worksheet over a month before they filed their petition and schedules, even though they knew the worksheet had become inaccurate and knew the worksheet was not signed under oath or penalty of perjury. They failed to correct the omission until the trustee demanded they turn over the funds. The trustee has met her burden by a preponderance of the evidence. Based on the totality of the cir-

cumstances, I find that the Barrows' concealment of over $13,000.00 constitutes bad faith, and bars its exemption.

■ At the very least, the Barrows acted with reckless indifference to the truth when they failed to correct a material falsehood on their schedules. "[S]tatements made with reckless indifference to the truth are regarded as intentionally false." *Korte v. I.R.S. (In re Korte)*, 262 B.R. 464, 474 (8th Cir. BAP 2001) (quoting *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr.E.D.Ark.1993)). "[A] series of omissions may create a pattern which demonstrates the debtor's reckless disregard for the truth." *Grant v. Sadler (In re Sadler)*, 282 B.R. 254, 264 (Bankr. M.D.Fla.2002). Neither the debtors nor their attorney made any attempt to ensure the schedules were accurate, even though it should have been obvious that the account balances would change over the weeks that passed between filling out the worksheet, preparing the petition and schedules, and filing. The Barrows claim that they thought they could pick any date for the "current value" of their assets, rather than the date of filing, as is required under the Bankruptcy Code. Their unfounded belief was unreasonable, and their explanation is troubling. Teri testified at the hearing, "These things are fluid." The Barrows gave no explanation as to why they believed the current value date was fluid, or why they believed they could choose any date other than the filing date. Even if they believed that they could pick any date to peg the current value of their assets when they signed their petition and schedules, it does not explain why, when the Barrows reviewed the documents page by page at their attorney's office, they were not concerned that the schedules asked them to provide the "current value" of their assets rather than the "approximate average daily balance."

Nor does it explain why they did not correct the substantial discrepancy at the meeting of creditors when they were specifically asked about omissions.

■ Debtors have an ongoing duty of disclosure regarding the information in their schedules. *Bauer* at 357 ("The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions."). "Exempting property is not a game of 'hide and seek' wherein the debtor quietly retains all property that the trustee does not find and then moves to amend the exemption schedules when the trustee becomes aware of the property." *In re Edmonds*, 27 B.R. 468, 469 (Bankr.M.D.Tenn.1983). Debtors bear an independent duty to provide accurate and complete information whether or not they have been assisted by counsel in preparing their schedules. *In re Rolland*, 317 B.R. 402, 414 (Bankr.C.D.Cal.2004) ("Whether or not the documents are prepared by an attorney, debtors bear an independent responsibility for the accuracy of the information contained in their schedules and statements."); *In re Pettey*, 288 B.R. 14, 20 (Bankr.D.Mass.2003) (although schedules were prepared by an attorney, "the Debtor had an independent obligation to verify the information in the schedules."). The casual attitude of the Barrows seems to have been that someone, perhaps their attorney, would tell them if and when they needed to correct the information they provided; essentially, that their responsibility ended when they provided their worksheet to their attorney. Unfortunately, their attorney's attitude was equally casual. Jim testified that had it been a year between the time they filled out the worksheet and filed their petition and schedules, it would have been obvious to him to correct the information. Over two months passed between the time that

the Barrows filled out their worksheet and the time that they appeared at their meeting of creditors. Their testimony that they did not realize they needed to disclose the 401(k) loan even by the time of the meeting of creditors was not credible.

The debtors' attorney certainly contributed to this problem and he could have avoided it. First, Albrecht's worksheet asked the wrong question so he gathered the wrong information to complete their schedules. His worksheet asked for the "approximate average daily balance" of their bank accounts, but the schedules require the "CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION." Second, Albrecht failed to ask them questions that might have elicited the correct information when they came in to review and sign their petition and schedules or at any time before the filing. It would have been possible for Albrecht to verify the account balances closer to the date of filing or at least impress upon the Barrows that they needed to inform him of changes to their financial situation. Third, Albrecht allowed weeks to pass between the receipt of the Barrows' worksheet, the day they reviewed and signed their petition and schedules, and the day he filed them. Albrecht received the Barrows' worksheet on June 15, 2008 and had completed the petition and schedules by July 2, 2008. The Barrows reviewed, approved and signed their petition and schedules on July 7, 2008, but the electronic signatures were only added on July 14, 2008, and they were not filed until July 15, 2008. When an attorney's client signs and dates the petition and schedules, the client is swearing to the completeness and accuracy of their information as of the signature date, but their continuing obligation is to provide complete and accurate information as of the date they are filed. To allow a week to

pass between the signing and filing was careless, and it was particularly inexcusable where electronic filing allows attorneys to instantly file documents from their offices at any time of day and on any day of the week. The length of the delay between the worksheet completion, signing, and filing makes it difficult for debtors to verify the information they are providing. Regardless, the 401(k) funds had been already deposited into the account before the Barrows actually reviewed and signed the petition, so in this case the delay did not cause the omission. The whole process of gathering information, failing to advise his clients properly or adequately verifying information demonstrates an attitude towards accuracy that can best be described as casual, even cavalier.

The debtors suggest that they relied on their attorney, but the advice must have been fully informed and reasonable. *Floret, LLC v. Sendecky (In re Sendecky)*, 283 B.R. 760, 765 (8th Cir. BAP 2002) (upholding bankruptcy court's finding that evidence of debtor's fraudulent intent was overcome by evidence that he had relied on the advice of an attorney, and that the advice was not unreasonable or uninformed); *Seaver v. Markey (In re Markey)*, 378 B.R. 594, 604 (Bankr. D.Minn.2007) ("reliance in fact on the advice of counsel may prevent a finding of actual knowledge of impropriety, at least 'if the advice is reasonable' and the attorney was fully-informed before giving it"); *Kaler v. Geller (In re Geller)*, 314 B.R. 800, 808 (Bankr.D.N.D.2004) (where debtors asserted as an affirmative defense that they relied on their attorney "to completely and accurately prepare their schedules and statement of affairs," the court found that their reliance did not excuse their false oaths because "[r]eliance on attorney advice absolves a debtor of fraudulent intent only when that reliance was reasonabl

and the advice given was informed advice."); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 898 (Bankr.D.N.D.1999) (where debtor provided her attorney with misinformation that he used to prepare her schedules, it was not an excuse that she relied on him to fill out her schedules accurately). The Barrows did not inform their attorney of the 401(k) loan or the true balance of their accounts at any time prior to the meeting of creditors or the trustee's letter demanding turnover, so his advice on the matter would not have been fully informed. Their attorney should have asked, but ultimately the responsibility to be accurate falls on the debtors.

Even if the Barrows had relied on their attorney's worksheet or believed that their attorney would tell them if they needed to update or correct their information, such reliance would not have been reasonable and would not excuse their conduct. In spite of their attorney's missteps, the inaccuracies should have been obvious to the Barrows when they carefully reviewed their petition, schedules, and statement of financial affairs and signed them under oath. Reliance on the attorney's worksheet would not have been reasonable because the Barrows understood that the worksheet was not an official document, but that their petition and schedules, statement of financial affairs, and testimony at the meeting of creditors were under oath. The worksheet itself clearly states, "Official Bankruptcy Forms will be completed using the information that you give in these worksheets and you will be required to sign a declaration stating under penalty of perjury that the information is true and correct." The Barrows knew what the petition and schedules said because they reviewed them page by page, and they knew when they approved them that the actual balance in their TCF Bank checking account was much higher than the amount listed. That they may have relied on their attorney to uncover their mistakes, verify their information, or ask them to update their worksheet would not have been reasonable and would not excuse their material misstatements.

The fact that the Barrows were eventually forthcoming when confronted with the inaccuracies does not exonerate them or excuse their conduct. "To allow debtors to ignore the seriousness of their oath, submit documents to the court which contain numerous material inaccuracies, and, when the inaccuracies are discovered, excuse their behavior [...] would undermine the whole structure of the system." *Jordan v. Bren (In re Bren)*, 303 B.R. 610, 616 (8th Cir. BAP 2004), *aff'd in part & rev'd in part on other grounds, Jordan v. Bren (In re Bren)*, 122 Fed.Appx. 285 (8th Cir. Jan. 27, 2005) (unpublished) (per curiam). Instead of taking ownership of their petition and schedules, which they signed under oath, they waited silently for the trustee to uncover the information on her own and only then did they admit to the omission and amend their schedules. If the Barrows were confused by the language on the schedules or if they had any doubt about the nature of the information they were asked to provide, they should have taken the initiative to seek clarification. Later, they should have brought the inaccuracies to the attention of their attorney or the trustee. Their failure to do so constitutes bad faith.

## CONCLUSION

Based on the totality of the circumstances, I find that the Barrows acted in bad faith when they knowingly understated their TCF Bank accounts on their schedules by over $13,000.00, failed to disclose their 401(k) loan on their statement of financial affairs, and testified to the accuracy of those documents at their meet-

ing of creditors. The omissions were false and material and bar the exemption of the funds.

## ORDER

THEREFORE, IT IS ORDERED:

The trustee's objection to the exemption of the debtors' checking account held at TCF Bank is sustained. The TCF account is exempt only to the extent of $325.00.